**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **ACIMA DIGITAL, LLC** and **ACIMA HOLDINGS, LLC**, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> **CONSUMER FINANCIAL PROTECTION BUREAU** and **ROHIT CHOPRA**, in his official capacity as Director of the CFPB, <br><br> *Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Matthew P. Previn (*pro hac vice* pending)
  matthewprevin@paulhastings.com
Bradley J. Bondi (*pro hac vice* pending)
  bradbondi@paulhastings.com
Traci Zeller (*pro hac vice* pending)
  tracizeller@paulhastings.com
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (212) 551-0201

Paul R. Genender (Texas Bar No. 00790758)
  paulgenender@paulhastings.com
Manuel G. Berrelez (Texas Bar No. 24057760)
  manuelberrelez@paulhastings.com
PAUL HASTINGS LLP
2001 Ross Avenue, Suite #700-168
Dallas, Texas 75201
Telephone: (972) 936-7500
Facsimile: (972) 936-7501

*Counsel for Plaintiffs Acima Digital, LLC and Acima Holdings, LLC*

1

Plaintiffs Acima Digital, LLC and Acima Holdings, LLC (together, "Acima" or "Plaintiffs") file this Complaint against the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and Rohit Chopra, in his official capacity as Director of the CFPB, for declaratory judgment and injunctive relief to halt the CFPB's illegal and unconstitutional investigation of, and threatened imminent litigation regarding, Acima's lease-to-own business.  Plaintiffs respectfully seek a judgment 1) declaring that the CFPB lacks legal authority to regulate Acima's lease-to-own business, as set forth below, 2) declaring that Acima has not violated any provisions of the law over which the CFPB possesses investigative, supervisory, rulemaking, or other regulatory authority, and 3) enjoining the CFPB from its continued assertion of investigative powers over, and from instituting threatened imminent litigation against, Acima.

Plaintiffs, by and through their undersigned attorneys, allege as follows:

## **INTRODUCTION**

1.      The purpose of this lawsuit is to halt the CFPB's illegal and unconstitutional attempt to expand its authority as limited by federal law and usurp the long-standing, comprehensive state regulatory framework governing the lease-to-own industry, which expressly recognizes that lease-to-own transactions are distinct from credit transactions.

2.      For almost four years, the CFPB has exceeded its statutory authority in pursuing an aggressive and illegitimate investigation of Acima's lease-to-own business, which the CFPB has no authority to regulate because it is already separately regulated by state lease-to-own laws and Acima does not extend "credit."

3.      The CFPB's investigation of, and threatened imminent litigation regarding, Acima's lease-to-own business also violates Plaintiffs' constitutional due process rights for failure

to provide fair notice.  Further, the CFPB's funding mechanism is unconstitutional because the Federal Reserve System does not have "earnings."

4.     Notwithstanding Acima's substantial concerns with, and expressed objections to, the CFPB's lack of statutory authority and violation of constitutional requirements, Acima cooperated with the Bureau's multi-year investigation, with the hope that, once the CFPB fully understood Acima's business, the CFPB would recognize that it lacked legal authority to investigate the company for purported violations of statutes that are plainly inapplicable to Acima's lease-to-own transactions.

5.     The CFPB has repeatedly ignored Acima's arguments and has incessantly plowed ahead, undeterred by the statutory and constitutional constraints on its investigative and enforcement authority under federal law.

6.     With each passing day, Plaintiffs continue to suffer substantial harm from the CFPB's ongoing and costly *ultra vires* investigation, which the CFPB recently escalated to a threat—and indeed explicit promise—of imminent litigation against Acima.  Faced with no other avenues to remedy this unremitting and illegitimate regulatory overreach, Plaintiffs have filed this Complaint.

7.     Acima has operated in the lease-to-own industry for over a decade.  Acima offers consumers flexible, short-term (one month at the longest) renewable leases, called Rental Purchase Agreements ("RPA"), under the laws of most states.  These RPAs allow consumers to take possession of household merchandise and other durable goods selected by consumers and purchased by Acima from third-party retailers and owned by Acima, such as furniture, appliances, or computers. Acima's consumers do not need to purchase the goods at the point of sale, do not need to use credit or incur debt to finance a purchase, and have no obligation.

8.      In a lease-to-own transaction, Acima approves applicants, then purchases eligible goods from the retailer.  Transactions are conducted in the retailer's physical store or online. Acima enters into an RPA with the consumer and the consumer takes possession of the goods, either immediately or soon thereafter via delivery.  Acima is the owner of the leased property in the customer's possession.  Each period provided in the lease, the customer decides whether to continue possession of Acima's property by making a lease payment to Acima or to terminate the lease and cease making payments, which the customer can do at any time without penalty. Under the RPA, the customer can renew or cancel each period, and if the customer makes enough optional lease renewal payments, the customer will then take ownership of the item outright.  Customers can also elect various early purchase options, all as allowed under state lease-to-own laws and described in the RPA.  Critically, Acima does not act as a lender and does not extend "credit" to the customer under the RPA. There is no loan of money by Acima that must be repaid or credit extended by Acima to the customer. The consumer can terminate the lease at any time without penalty.

9.      By offering customers who otherwise might be denied or lack access to credit the opportunity to receive approval for a short-term renewable and terminable lease agreement with clearly defined ownership options if elected by the customer, Acima expands underserved consumers' access to much-needed durable goods on flexible terms that meet their needs.

10.      Lease-to-own transactions have existed in the United States for many decades.  The lease-to-own industry is heavily regulated by the states, with at least 46 of 50 states and the District of Columbia maintaining comprehensive laws or regulations expressly governing lease-to-own transactions and recognizing them as distinct from credit transactions.  Conversely, Congress has declined to enact legislation regulating lease-to-own transactions.

11.     Nevertheless, the CFPB has sought to usurp these comprehensive state laws regulating the lease-to-own industry and has proclaimed, unilaterally and without Congressional authority, that the CFPB has the power to police Acima's leases under, and sue the company for alleged violations of, the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5481–5603, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693–1693r.

12.     But the relevant provisions of these three statutes do not apply to Acima's lease-to-own transactions.  These statutory provisions apply only to lenders that offer "credit."  Acima is not a lender and does not offer credit.

13.     In its unauthorized attempt to regulate lease-to-own transactions under federal law, the CFPB impermissibly seeks to circumvent these express statutory limitations by sleight of hand. It incorrectly posits that Acima's leases, either all of them or at least some of them under certain circumstances that apparently only the CFPB knows, are not lease transactions—which generally are not subject to the CFPA, TILA, or EFTA—but somehow constitute "credit" transactions, despite express and unambiguous language in the RPA stating that the transaction is a "lease" and "not a loan or credit transaction."  Acima's leases do not extend "credit" as a matter of law, and the CFPB in its regulatory overreach cannot pretend otherwise.  For at least three reasons, the Bureau's illegal power-grab cannot withstand even a modicum of judicial scrutiny.

14.     First, the plain language of the CFPA, TILA, and EFTA make clear that Acima's lease-to-own transactions do not fall within the scope of those statutes.

15.     Second, the states have comprehensively regulated the lease-to-own industry since its inception. Action by the CFPB suddenly to assert enforcement authority over this substantial, decades-old industry is a major policy decision requiring an act of Congress.  *See West Virginia v.*

*EPA*, 142 S. Ct. 2587 (2022).  The statutes at issue on their face do not apply to Acima's leases, and Congress has never suggested otherwise.  Indeed, Congress repeatedly has declined to pass legislation that would regulate the lease-to-own industry.

16. <u>Third</u>, it is the province of the courts, and not a federal agency, to decide whether the governing statutes authorize the CFPB to assert its conflicting regulatory authority over short-term lease-to-own transactions absent explicit statutory authority.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).  The CFPB is entitled to no judicial deference regarding its incorrect interpretation of the CFPA, TILA, and EFTA.

17. The CFPB's investigation of, and threatened imminent litigation regarding, Acima's lease-to-own business is not merely illegal; it is also unconstitutional, for two independent reasons.

18. <u>First</u>, the CFPB's pursuit of Acima's lease-to-own business violates Plaintiffs' constitutional due process rights for failing to provide Plaintiffs the required fair notice that the CFPB would suddenly attempt to regulate lease-to-own transactions by classifying them as "credit" transactions. *During the course of the CFPB's investigation*, the CFPB itself published guidance declaring that lease-to-own transactions do not constitute "credit."[1]  *Even if* the CFPB's new and flawed interpretation that lease-to-own transactions are "credit" transactions under the CFPA, EFTA, and TILA were consistent with those statutes, and that interpretation is not, the Bureau is retroactively trying to apply its new interpretation of those statutes to regulate conduct that occurred before the Bureau provided fair notice of that new interpretation.

---

[1] *See* CFPB Taskforce on Fed. Consumer Fin. Law, Report Vol. I, at 215 (Jan. 2021) https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf (hereinafter "CFPB Taskforce Report").

19.     <u>Second</u>, the CFPB's investigation of Acima is unconstitutional because the CFPB's funding mechanism is unconstitutional.  The Supreme Court's decision in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024), upheld the CFPB's "Payday Lending Rule" on the grounds that the Appropriations Clause authorizes Congress to fund the CFPB independently from the annual appropriations process using profits from the Federal Reserve System.  But the Supreme Court's decision contained a major caveat:  The CFPB's funding statute is a permissible use of the Appropriations Clause so long as the CFPB "draw[s] funds from the combined *earnings* of the Federal Reserve System."  *Id.* at 435 (emphasis added).  In other words, the Federal Reserve must be making a *profit*.  But the Federal Reserve has not made a profit since 2022.  Given the rise in interest rates, the Federal Reserve System has been operating at a loss for the past two years.

20.     Plaintiffs are entitled to a judgment declaring that the CFPB's investigation is invalid for exceeding the scope of the CFPB's statutory authority and for usurping the jurisdiction of the states to regulate the lease-to-own industry.  Further, Plaintiffs are entitled to a judgment declaring that the entirety of the Bureau's investigation violates the Constitution and that the CFPB may not continue its tainted proceeding in any way, including through litigation or further attempts to impose its authority outside the bounds of its enabling statutes.  Plaintiffs also respectfully submit that they are entitled to a stay of, or injunction against, the CFPB's investigation and any subsequent litigation pending disposition of the claims presented in this Complaint.

## JURISDICTION AND VENUE

21.     This Court has competent subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States as well as the United States Constitution.

22.     This Court has authority to grant declaratory and injunctive relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and under its inherent equitable powers.  An

actual and justiciable controversy exists between Plaintiffs and the CFPB, given the CFPB's unequivocal communication to Plaintiffs that it intends imminently to commence legal action against Plaintiffs if Plaintiffs do not submit to and acknowledge CFPB jurisdiction over matters that are beyond the CFPB's authority to regulate.

23.     Venue is proper in this District because "a substantial part of the events or omissions giving rise to the claim occurred" in the city of Plano, Texas, located in Collin County and within the Sherman Division of the United States District Court for the Eastern District of Texas.  28 U.S.C. § 1391(e)(1)(B).

24.     Acima Digital, LLC is a wholly-owned subsidiary of Acima Holdings, LLC.   In turn, Acima Holdings, LLC is a wholly-owned subsidiary of Upbound Group, Inc. ("Upbound"), a Nasdaq-listed corporation with its headquarters and principal place of business at 5501 Headquarters Drive, Plano, Texas 75024, located in Collin County and within the Sherman Division of the United States District Court for the Eastern District of Texas.

25.     Major corporate decisions pertaining to Acima are made in Plano, Texas, and relevant parties and documents are located in Plano, Texas, all within the Eastern District of Texas.

26.     Ten of Acima Digital, LLC's thirteen officers and all three of its managers are located in Plano, Texas, including Acima Digital, LLC's President, Treasurer, Secretary, Vice President – Chief Technology and Digital Officer, Vice President – Chief Human Resources Officer and Chief Diversity Officer, Vice President – Chief Marketing Officer and Chief Customer Officer, Vice President – Controller, Vice President – Chief Risk Officer, Vice President – Tax, and Assistant Secretary.

27.     Ten of Acima Holdings, LLC's thirteen officers and all three of its managers are located in Plano, Texas, including Acima Holding, LLC's President, Treasurer, Secretary, Vice

President – Chief Technology and Digital Officer, Vice President – Chief Human Resources Officer and Chief Diversity Officer, Vice President – Chief Marketing Officer and Chief Customer Officer, Vice President – Controller, Vice President – Chief Risk Officer, Vice President – Tax, and Assistant Secretary.

28.     Upbound's Chief Executive Officer has ultimate authority over Acima's business operations and is located in Plano, Texas.

29.     Upbound's General Counsel & Corporate Secretary has ultimate authority and oversight over Acima's legal and compliance functions and is located in Plano, Texas.

30.     Ultimate decision-making regarding Acima's marketing, human resources, risk, and tax functions take place in Upbound's headquarters in Plano, Texas.

31.     Acima relies on Upbound's information technology shared services function, which is located in Plano, Texas.  Upbound's information technology shared services function maintains and oversees corporate documents and records, including access to electronic records stored on servers Acima uses to access and store documents and records.

32.     The determination of the issues in the present Complaint impact and affect the business of Upbound as the corporate parent of Acima.  If the CFPB were to prevail in its anticipated, yet meritless, lawsuit against Acima, Acima and Upbound would suffer real and concrete injuries.

## PARTIES

### A.     Plaintiffs

33.     Plaintiffs Acima Digital, LLC and Acima Holdings, LLC are Utah limited liability corporations with their managers, officers, and employees primarily located in Plano, Texas and Draper, Utah.  Acima Digital, LLC is a wholly-owned subsidiary of Acima Holdings, LLC.  Acima Holdings, LLC is a wholly owned subsidiary of Upbound, which has its headquarters and principal

place of business within the Sherman Division of the United States District Court for the Eastern District of Texas.

**B.**     **Defendants**

34.     The Consumer Financial Protection Bureau is a federal government agency of limited jurisdiction that, among other things, enforces certain claims under federal consumer finance laws.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010).

35.     Defendant Rohit Chopra, sued in his official capacity, is a natural person who currently serves as Director of the CFPB.

## FACTS

**A.**     **Acima's Business Model and the Lease-to-Own Industry**

36.     Acima improves the quality of life of its customers by providing them with the opportunity to obtain ownership of high-quality, name-brand household products and other durable goods under flexible, short-term (one month at the longest) lease-to-own agreements with no long-term obligation.

37.     The multi-billion lease-to-own industry, which first arose in the United States in the 1970s, serves many millions of customers—including customers who have limited access to credit and customers who value the significant flexibility afforded by lease-to-own transactions, such as college students, military personnel, and other individuals who relocate often and need flexible leasing options—and fills an important economic gap in the marketplace.

38.     By offering customers who otherwise might be denied credit the opportunity to receive approval for a short-term renewable lease agreement with the customer's ability to choose whether to purchase the leased goods at any point or to terminate without penalty at any time,

Acima expands underserved consumers' access to much-needed durable goods.  Acima provides short-term renewable lease agreements in compliance with comprehensive state laws that recognize these lease-to-own transactions as distinct from credit transactions because of the well-established differences between credit and lease-to-own transactions.

39.     Although lease-to-own companies originally provided these lease-to-own transactions only through their own brick-and-mortar stores, like in many other industries, these transactions have expanded to additional shopping channels to provide more convenience and choice for consumers, including the ability for over a decade to enter into these transactions through e-commerce, digital commerce, and third-party retailers.

40.     Acima provides RPAs that vary as required in their wording in order to comply with the applicable state laws governing lease-to-own transactions.  In Texas, like many states, this lease agreement is called a "Rental-Purchase Agreement."

41.     In each lease-to-own transaction, after a customer applies and is approved, Acima first purchases the selected item eligible for a short-term renewable lease agreement from a participating retailer.  At this point, Acima owns the item.  This status is made clear in the RPA between Acima and the lease-to-own customer.  The RPA states: "**Ownership and Nature of Agreement:  WE OWN THE PROPERTY**".  Exhibit A (Rental-Purchase Agreement) at 3 (emphasis in original).

42.     The RPA is explicit and unambiguous that the transaction is a lease and not a loan. The RPA states on the first page in bolded and underlined text, "**This transaction is a rental-purchase agreement ("Agreement")…<u>This is not a loan or credit transaction.</u>**" *Id.* at 1.  The second page of the agreement provides additional details regarding the lease, including a table disclosing the potential purchase prices for the leased property if elected by the customer at

different future periods.  *Id.*  The customer chooses whether the rental period for that item is a week, two-weeks, or (at the longest) a month, and each period the customer, if he or she desires to continue to use and possess Acima's property, makes payments for the rental period in advance.

43.     At the end of each optional rental period, the customer can either terminate the RPA without penalty or renew the lease by making the next lease payment for the upcoming period. The customer has no obligation to renew the lease, and Acima owns the item at all times during each rental period.  The customer does not acquire ownership of the item unless and until the customer either (i) exercises an early purchase option to acquire ownership of the leased goods, or (ii) pays to renew the lease for a final optional rental period, as disclosed in the RPA.  The ownership of the leased item transfers from Acima to the customer *only if* one of those two events occurs.

44.     The customer may terminate the agreement at any time without penalty.  This ability to terminate is stated clearly in the RPA: "You may terminate the Agreement at any time, without penalty, and stop unaccrued renewal payments by returning the property to Acima and paying any past due renewal payments."  Exhibit A at 1.  Customers have the option to terminate the lease *even if* they are past due on previous rental payments for periods when they continued to retain possession of Acima's property.  Once a customer elects to terminate the RPA, rent is automatically paused so that the customer can finalize the termination process.  The customer has multiple options to return the property without paying a penalty to Acima, all as disclosed to the customer.

45.     The customer always has the option to take advantage of an early purchase option. The RPA describes this process at the top of the first page in bolded text, "**The Agreement includes a {EARLY_PURCHASE_OPTION_TERM} Early Purchase Option.  This Early**

Purchase Option may be an amount greater than the merchant's sale price and not 'same as cash.'" *Id.*

46.    These short-term lease-to-own transactions are distinct from credit or financing transactions.  In the lease-to-own transaction, Acima's lease-to-own customer does not have a debt obligation to Acima, and Acima does not provide credit to its lease-to-own customer.  There is no "debt trap" for the customer because Acima does not loan money, and there is nothing for the lease-to-own customer to repay if the customer chooses not to continue renting Acima's property.  The lease-to-own customer does not purchase the item upfront, and Acima does not finance any such upfront purchase.  Instead, the lease-to-own customer pays Acima *solely* for the right to possess and use the leased property for a short period of time.  Throughout the term of the short-term lease agreement, the customer maintains the ability to terminate the agreement without any penalty or obligation for future rental payments.

B.    <u>The Authority of the States To Regulate the Lease-to-Own Industry</u>

47.    Lease-to-own transactions, like those that Acima enters into with its customers, have existed, and have been heavily regulated by state law, for decades.

48.    At least forty-six states currently have specific lease-to-own laws that impose comprehensive regulations on lease-to-own transactions.  These statutes range from policing the language that lease-to-own companies must use in their notices and disclosures to customers, *see, e.g.*, Tex. Bus. & Com. Code § 92.052; N.Y. Pers. Prop. Law § 501; Cal. Civ. Code § 1812.623; 815 Ill. Comp. Stat. Ann. 655/1 (2018), to fixing both cash prices and total rent-to-own prices, *see, e.g.*, N.Y. Pers. Prop. Law § 503 (regulating "maximum cash price"), to setting specifications on fees and payments.  *See, e.g.*, Tex. Bus. & Com. Code § 92.053 (requiring that charges in addition to periodic payments "be reasonably related to the service performed"); Cal. Civ. Code § 1812.624

(proscribing certain fees); 815 Ill. Comp. Stat. Ann. 655/1 (2018) (same).  In addition, state lease-to-own laws specifically distinguish lease-to-own transactions from credit by expressly excluding credit from the scope of the lease-to-own statutes.  *See, e.g.*, Cal. Civ. Code § 1812.622(d) (A "Rental-purchase agreement shall not be construed to be, nor be governed by, and shall not apply to … [a] consumer credit contract.").

49.     To the extent a lease-to-own company fails to meet these detailed state law requirements, the remedy for any such violations lies expressly within those state laws as enforced by state Attorneys General.

### C.     The CFPB's Limited Jurisdiction Under Federal Law

50.     Although lease-to-own transactions are governed by state law, other financial transactions (not at issue in this matter) fall within the purview of the CFPB.

51.     As part of the Dodd-Frank Act enacted in 2010, Congress created the CFPB to serve as an agency responsible for implementing and enforcing certain consumer financial services laws. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 206 (2020).

52.     As a creature of statute, the CFPB is an agency of limited jurisdiction and authority.

53.     The CFPB has supervisory and enforcement powers that are defined and confined by the Dodd-Frank Act, the boundaries of which reflect political compromises within the legislature.  For example, Congress transferred the administration of more than a dozen specific federal statutes to the CFPB, including TILA, EFTA, and other specified consumer protection laws.  Congress vested the CFPB with the authority to enforce these statutes and adjudicate administrative proceedings.

54.     The Bureau has no broader authority than that granted it by Congress.  Congress did not give the CFPB authority to enforce any statute governing lease-to-own transactions.  If

Congress had intended to give the CFPB such sweeping powers to regulate these transactions, which affect an entire multi-billion dollar industry that serves many millions of customers each year and has long been regulated by substantially every state in the country, Congress would have expressly legislated those powers and made a determination to preempt these comprehensive state laws.

       **D.**      **The CFPB's Investigation of Acima and Impending Litigation**

      **55.**     On October 1, 2020, the CFPB commenced an investigation by issuing a Civil Investigative Demand ("CID") to Acima.

      **56.**     Pursuant to the notification requirements under 12 C.F.R. § 1080.5, the CFPB stated in the CID that the purpose of its investigation was to determine:

      a.     "(1) whether persons that allow consumers to obtain certain consumer goods and services by requiring consumers to make periodic payments are offering or extending credit, offering leases, or otherwise offering or providing a consumer financial product or service;"

      b.     "(2) whether these persons, in connection with offering or providing a consumer financial product or service are engaging in false or misleading representations or omissions to consumers, or are failing to provide consumers with the transaction's terms, in a manner that is unfair, deceptive, or abusive in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536;"

      c.     "(3) whether these persons, in connection with extending credit, are failing to provide required disclosures to consumers, in a manner that violates the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and its implementing Regulation Z;" and

d.      "(4) whether these persons, in connection with offering leases, are failing to provide required disclosures to consumers, in a manner that violates the Consumer Leasing Act, 15 U.S.C. § 1667 et seq., and its implementing Regulation M."[2]

57.     The CFPB subsequently served several additional CIDs on Acima, which demanded extensive documents, data, and testimony.

58.     Acima had, and continues to have, grave concerns as to the CFPB's statutory and constitutional authority to pursue its "fishing expedition" of an investigation of Acima. Nevertheless, Acima cooperated with the CFPB, hoping the CFPB (once it fully understood Acima's business and the lease-to-own transaction) would recognize that Acima was not "offering or extending credit" or "otherwise offering or providing a consumer financial product or service," and, therefore, is not subject to the statutory provisions the CFPB purported to be investigating.

59.     Acima cooperated extensively with the CFPB, incurring substantial legal fees, producing millions of pages of documents, and expending enormous resources responding to the CFPB's illegitimate investigation.

60.     On June 20, 2023, Acima provided a 57-page submission to the CFPB explaining why, as a matter of statutory interpretation, the CFPA, TILA, and EFTA did not permit the CFPB to bring any potential claims against the company because Acima was not a creditor and its leases were not credit.

61.     Now, four years into an intrusive investigation process, the CFPB already should have recognized that these lease-to-own transactions are beyond its statutory authority and that any investigation and enforcement proceeding should be left to the states under their lease-to-own

---

[2] The CFPB's proposed consent order and threatened imminent litigation did not include a claim that Acima violated the Consumer Leasing Act or Regulation M.  This Complaint, therefore, does not address either the Consumer Leasing Act or Regulation M.

laws.  Nevertheless, on May 15, 2024, after months of silence, the CFPB finally informed Acima that it intended to sue Acima if the company was unwilling to settle on terms that are impossible for the company to accept.  That same day, the CFPB sent a settlement offer in the form of a proposed consent order and a term sheet with a request to enter into a three-month tolling agreement.

62.     From May 20–21, 2024, Acima and the CFPB exchanged email correspondence in which the CFPB rejected Acima's offer to enter into a tolling agreement that would have provided that the CFPB would not sue Acima during the tolling period but would have given the CFPB (and Acima) the ability to withdraw from the order on seven days' notice.  Because the CFPB rejected that proposal, Acima and the CFPB agreed to a much shorter, one-month tolling agreement (with no conditions) effective from May 28 through June 29, 2024.

63.     On June 14, 2024, Acima sent the CFPB a markup of the Bureau's settlement term sheet.

64.     On June 20, 2024, the CFPB flatly rejected Acima's markup of the settlement term sheet.

65.     In response, on June 28, 2024, Acima requested a meeting with senior members of the CFPB enforcement staff to discuss various threshold issues critical to any potential settlement agreement.

66.     On July 9, 2024, the CFPB rejected Acima's request for a settlement meeting and demanded that Acima provide a markup of its proposed lengthy consent order, rather than the term sheet that the CFPB provided.  The CFPB further declared that CFPB lawyers have been "instructed to move forward with preparing to file a lawsuit" against Acima.

67.     On July 11, 2024, Acima agreed to provide proposed revisions to the draft consent order but explained that it would need three weeks to do so, because of the order's length and the fact that it raises significant operational issues, which in turn require significant stakeholder review.  The following day, the CFPB instructed Acima via teleconference that Acima could have only until the arbitrary date of July 23, 2024 to provide its settlement counteroffer, without any explanation and despite Acima's offer of a further tolling agreement.

68.     On July 16, 2024, the CFPB again emailed Acima, writing: "As we previously informed you, we have been preparing to file a lawsuit against Acima … and the window to achieve a resolution is rapidly closing."

69.     The CFPB's threatened lawsuit is clearly imminent and anticipated.  Acima and Upbound have suffered injury-in-fact from the CFPB's illegal and unconstitutional investigation and will continue to suffer injury if the CFPB initiates litigation.  The CFPB's illegal and unconstitutional exercise of its jurisdiction directly impacts Upbound as the sole owner of Acima. A determination of whether the CFPB's actions are legal and constitutional is crucial for Upbound.

70.     Specifically, the CFPB has threatened to bring the following claims against Acima, pursuant to statutes that are inapplicable to Acima's state-regulated lease-to-own transactions:

a.     Acima allegedly engaged in various unfair, deceptive, and abusive practices under the CFPA, 12 U.S.C. §§ 5531(a), (c), and (d); 5563(a).

b.     Acima allegedly violated EFTA, 15 U.S.C. § 1693k(1), and its implementing Regulation E, 12 C.F.R. § 1005.10(e)(1), by conditioning the extension of credit on repayment through preauthorized EFT.

c.     Acima violated the TILA and its implementing Regulation Z by failing to provide disclosures required by 12 C.F.R. §§ 1026.17 and 1026.18.[3]

## STANDING

**71.**     Plaintiffs have Article III standing to pursue the claims in this Complaint.

**72.**     "To establish Article III standing, a plaintiff must show" that it [1] "has suffered an 'injury in fact' that is [2] 'fairly traceable' to the defendant's conduct and [3] would likely be 'redressed by a favorable decision.'"  *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

**73.**     With respect to the injury-in-fact requirement, Plaintiffs have suffered, are suffering, and will continue to suffer an injury in fact because of the CFPB's *ultra vires* investigation and threat of imminent civil litigation.  *See, e.g.*, *Seila Law*, 591 U.S. at 211 (finding that, in the context of a constitutional challenge to the CFPB, the petitioner suffered a "concrete injury" because it was "compelled to comply with [a] civil investigative demand and to provide documents it would prefer to withhold").

**74.**     The unconstitutional nature of the CFPB's investigation alone creates a "here-and-now" injury that is ripe for adjudication.  *Seila Law*, 591 U.S. at 212 (explaining that the Supreme Court has rejected the argument that consideration of a removal provision that violates the separation of powers is not ripe until used because "when such a provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court").  This matter is particularly ripe given Plaintiffs' continuing (and ever-growing) injuries.

---

[3] Although the crux of the CFPB's investigation and potential claims concern the issues addressed in this Complaint, the CFPB also has investigated and threatened a claim against Acima for certain alleged violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x, which this Complaint does not address specifically.  If the CFPB is ruled to be unconstitutional, that claim under the Fair Credit Reporting Act would be improper.

75.     Further, Plaintiffs' injuries are concrete and particularized.  Plaintiffs already have incurred millions of dollars in legal fees defending against the CFPB's illegal and unconstitutional investigation, produced millions of pages of documents to the government, and expended an enormous amount of time and resources defending against an investigation that both exceeds the CFPB's statutory authority and is unconstitutional.   This type of "pocketbook injury is a prototypical form of injury in fact."  *Collins*, 594 U.S. at 222; *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing."). Plaintiffs also have incurred reputational injury due to the ongoing shadow cast by the CFPB investigation.

76.     Further, absent this Court's intervention, the CFPB will commence civil proceedings against Acima, alleging violations of the CFPA, TILA, and EFTA.   Those proceedings, and the imminent cost of defending against them, will be harmful to Acima and constitute continuing clear injuries in fact.

77.     There is a causal connection between Plaintiffs' injuries and the CFPB's conduct. All of Plaintiffs' injuries are attributable to, and were inflicted by, the CFPB, and there is a clear causal connection between the CFPB's unlawful exercise of statutory authority and the injuries Plaintiffs have suffered because of the CFPB's multi-year investigation.  If the CFPB had never initiated the investigation, Plaintiffs would not have suffered the financial and reputational injuries discussed above.  *See Collins*, 594 U.S. at 222.

78.     Plaintiffs' injuries in fact are redressable through this lawsuit.  This Court can and should declare that (1) the CFPB's investigation into, and threatened imminent lawsuit regarding, Acima's lease-to-own business is illegal for attempting to police conduct beyond the scope of the CFPB's statutory authority and would impermissibly usurp the jurisdiction of the states to regulate

the lease-to-own industry; (2) Acima has not violated any provisions of law over which the CFPB possesses enforcement authority; and (3) the CFPB's investigation into, and threatened litigation regarding, Acima's lease-to-own business is unconstitutional in light of the CFPB's failure to provide fair notice and due to the unconstitutional funding structure of the CFPB.  Moreover, this Court can and should stay the continuation of the CFPB's investigation and enjoin the CFPB from initiating any further unwarranted investigations or litigation or other attempted exercises of authority pending resolution of Acima's claims.  That relief would terminate Plaintiffs' injury caused by an unlawful agency proceeding and would end the related injuries associated with the ongoing expense of that proceeding and any other similar proceedings or activities by the CFPB. Such relief also would prevent future imminent injuries that the CFPB will continue to inflict through its investigation and threatened lawsuit.

### CLAIMS FOR RELIEF

### Count 1 (Declaratory Relief):  The CFPB's Investigation Exceeds Its Statutory Authority

79.     Plaintiffs incorporate by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

80.     The CFPB is an independent agency of limited jurisdiction with statutory enforcement authority over certain causes of action under certain statutes.  The CFPB's investigation of, and threatened imminent litigation regarding, Acima's lease-to-own business is fatally flawed.  The CFPB has no authority to regulate Acima's state-law governed lease-to-own transactions because these transactions are not "credit."

81.     <u>First</u>, quite unlike the specifically designated state lease-to-own laws across the country, as the plain language of the CFPA, ETFA, and TILA makes clear, Acima's lease-to-own transactions do not fall within the explicitly defined scope of those statutes.

82.     With respect to the CFPA, the Bureau has jurisdiction to bring claims only against

a "covered person." *See* 12 U.S.C. § 5536(a)(1)(B).  The CFPA defines a "covered person" as "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).

83.     None of the statutorily enumerated categories of consumer financial products or services includes rental-purchase agreements like Acima's lease-to-own transactions.  12 U.S.C. § 5481(15)(A).  Because Acima's lease-to-own transactions are not a "consumer financial product or service," Acima is not a "covered person," and the Bureau lacks statutory authority to bring a CFPA claim against Acima.

84.     With respect to EFTA, EFTA provides that no person shall "condition the extension of *credit* to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers[.]" 15 U.S.C. § 1693(k)(1) (emphasis added).  Regulation E defines "credit" as "the right granted by a *financial institution* to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor."  12 C.F.R. § 1005.2(f) (emphasis added).  Acima does not grant consumers the right to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor.  Because Acima does not extend "credit," the Bureau lacks statutory authority to bring an EFTA claim against Acima under 15 U.S.C. § 1693(k)(1).

85.     Regulation E also defines a "financial institution" as a "bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services."  12 C.F.R. § 1005.2(i).  Acima is not a "bank, savings association, or credit union," nor has it ever represented itself to be one.  Acima also does not "directly or indirectly hold an account belonging to a consumer."  Acima further does not "issue an access device" to

consumers.  As such, Acima is not a "financial institution" under the EFTA.

86.     With respect to TILA, the disclosures required under TILA apply only to "credit" or "credit sales."  15 U.S.C. § 1638; 12 C.F.R. §§ 1026.18, 1026.17 (Regulation Z).  TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(f).  TILA defines "credit sales" as "any sale in which the seller is a creditor.  The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract."  12 C.F.R. § 1026.2(a)(16).

87.     Acima's lease-to-own customers execute short-term leases for durable goods for a lease term of no more than one month.  The payment owed for each rental period compensates Acima only for the customer's use of the leased goods during that short length of time, which rental payment amount is far less than the full leased property value.  The lease-to-own customer may terminate the RPA at any time without penalty.  Because Acima's lease-to-own customers do not enter "contracts to pay…substantially equivalent to or in excess of the" leased property value, *id.*, Acima does not provide "credit sales."  Furthermore, an exemption under TILA provides that leases like Acima's RPAs that are "terminable without penalty at any time by the consumer" are not "credit sales."  12 C.F.R. § 1026.2(a)(16).  As such, the Bureau lacks statutory authority to bring a TILA claim against Acima because Acima's lease-to-own transactions are neither credit nor credit sales.

88.     Second, to the extent there is any ambiguity with respect to the statutory language of the CFPA, EFTA, and TILA (and there is no such ambiguity), the Bureau's assertion of

enforcement authority over these lease-to-own transactions violates the major questions doctrine. The major questions doctrine provides that, in areas with particular economic and political significance, the Supreme Court will "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia*, 142 S. Ct. at 2609 (citation omitted). The CFPB's attempt to expand its limited jurisdiction to cover short-term lease-to-own agreements raises major questions about the limits to the CFPB's authority to regulate a multi-billion dollar industry, that for decades has been regulated extensively by state law, affecting the millions of consumers in the United States per year who rely on short-term lease-to-own arrangements for the use of household goods. Since 1993, Congress has had multiple opportunities to pass legislation to regulate the lease-to-own industry but has consistently and repeatedly declined to do so. Instead, Congress has ceded regulation of these products to the states, over forty-six of which have laws specifically governing rent-to-own transactions. *See supra* ¶ 48. Because Congress did not explicitly delegate authority to the Bureau under the CFPA, EFTA, or TILA to regulate lease-to-own-transactions, under the major questions doctrine, the Court should find the CFPB's assertion of that enforcement authority to be an illegal application of those statutes.

89.     Third, any determination of the scope of the CFPB's statutory enforcement authority is the province of the courts, not the Bureau. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. The CFPB is not entitled to any deference into its own, lawless assertion of authority over the lease-to-own industry. Reinterpreting the CFPA, TILA, and EFTA to include Acima's lease-to-own agreements, as the Bureau purports to do here, replaces Congress's judgment with its own, in direct conflict with clear language in each statute limiting its scope to

transactions involving the extension of credit.  *See New Mexico v. DOI*, 854 F.3d 1207, 1224 (10th Cir. 2017) ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.") (quotations omitted).  The CFPB simply has no authority to claim such broad regulatory authority.

90.     Absent the Court's intervention, Acima will continue to be subjected to the CFPB's illegal and unconstitutional activities beyond its clearly defined statutory enforcement authority. Acima is therefore seeking to:

a.     enjoin the CFPB from any further investigation into Acima in connection with its activities in the lease-to-own industry, whether in the pending investigation or any additional investigation;

b.     enjoin the CFPB from initiating any civil litigation against Acima in connection with its activities in the lease-to-own industry; and

c.     enjoin the CFPB from seeking to exercise any other investigative, supervisory, enforcement, rulemaking or other regulatory authority over Acima or its lease-to-own transactions.

91.     For the reasons stated herein, Plaintiffs are entitled to a judgment under the Federal Declaratory Judgment Act and Federal Rule of Civil Procedure 57.

### Count 2 (Declaratory Relief): The CFPB's Investigation is Unconstitutional

92.     Plaintiffs incorporate by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

93.     There are two independent constitutional infirmities with the CFPB's investigation of, and threatened imminent litigation regarding, Acima's lease-to-own business, each of which supports declaratory relief.

94.     <u>First</u>, the CFPB's investigation of, and threatened imminent lawsuit against Acima, violates Plaintiffs' constitutional due process rights.  Constitutional due process requires Acima to have fair notice that the CFPB would attempt to regulate lease-to-own transactions by classifying them as "credit" transactions.

95.     Lease-to-own transactions have existed and been regulated extensively by state law for decades.[4]  The CFPB's enabling statutes and its own guidance gave Acima and other industry participants substantial reasons to believe that the CFPB would not seek to characterize short-term lease-to-own transactions to be "credit" under the CFPA, TILA, or EFTA.  *See* 12 U.S.C. § 5481(15)(A)(ii) (stating that in order for a lease to be considered the functional equivalent of a purchase finance arrangement subject to the CFPA, the lease must be (1) a non-operating lease, (2) *with an initial term of at least ninety days*); CFPB Taskforce Report at 215 ("Strictly speaking, *rent-to-own transactions are not credit*.") (emphasis added).  Under its current leadership, the Bureau subsequently revoked its previous guidance, but provided no notice or opportunity to comment before taking contrary positions.[5]

96.     Only recently, in an enforcement action against another company in the lease-to-own industry, did the CFPB provide Acima or other lease-to-own companies with notice that its leases were somehow subject to regulation by the CFPB as "credit" transactions, under the CFPB's flawed attempts to expand its jurisdiction beyond its statutory limits.  *See* Complaint, *CFPB v. Snap Finance LLC, et. al*, No. 2:23-cv-00462-JNP-JCB (D. Utah Jul. 19, 2023); Consent Order, *Tempoe, LLC*, CFPB No. 2023-CFPB-0010 (Sept. 11, 2023).

---

[4] Plaintiffs acknowledge that the Federal Trade Commission has authority to enforce certain consumer protection laws that prevent unfair or deceptive acts or practices.

[5] The Taskforce on Federal Consumer Financial Law Report now contains an undated disclaimer, added after the CFPB's initial publication of the report, which states: "[t]his report was produced in violation of the Federal Advisory Committee Act ("FACA") … [b]ecause the Taskforce did not comply with FACA's requirements, readers should not assume that the report provides sound advice."  CFPB Taskforce at i (as amended) (quotations omitted).

97.     The Bureau now seeks to hold Acima liable retroactively for short-term lease-to-own transactions that took place *before* the Bureau reversed its long-held interpretation that these transactions were not "credit."  *See PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16, 2017), *on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) (vacating the original opinion on other grounds).  Neither Acima nor other lease-to-own industry participants had any notice, much less fair notice, that the CFPB in 2023 would reverse its position and, in seemingly arbitrary fashion, decide to regulate these lease-to-own arrangements as "credit" transactions under federal law.  Using the words of the Supreme Court in *SmithKline*, Acima cannot be expected to have "divine[d] the agency's interpretations in advance."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).

98.     By asserting that Acima's lease-to-own transactions are "credit" transactions within the purview of the CFPA, TILA and EFTA, the Bureau has violated Acima's constitutional due process right to fair notice.

99.     Second, the CFPB's investigation of Acima is unconstitutional because the CFPB's funding mechanism is unconstitutional.  The Supreme Court recently held that the Appropriations Clause only authorizes the Federal Reserve System to fund the CFPB so long as it "draw[s] funds from the combined *earnings* of the Federal Reserve System."  *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 435 (emphasis added).

100.     The Federal Reserve has not made a profit or, stated otherwise, has not had *earnings* since 2022.  When the Federal Reserve does not have *earnings* to fund the CFPB, the Bureau's general operations, including its investigative and enforcement activity, are not within the scope of the Appropriations Clause.  Where the agency's actions are illegal, Acima is entitled to a

declaratory judgment that the agency's actions since 2022 are unconstitutional and invalid.  This argument has found support within the academic community.[6]

101.    Absent the Court's intervention, Acima will continue to be subjected to the exercise of unconstitutional conduct by the CFPB.  For each independent ground of unconstitutional action, Acima is therefore seeking to:

a.    enjoin the CFPB from any further investigative procedures into Acima, whether in the pending investigation or any additional investigation;

b.    enjoin the CFPB from initiating any civil action against Acima; and

c.    enjoin the CFPB from seeking to exercise any other investigative, supervisory, enforcement, rulemaking or other regulatory authority over Acima or its lease-to-own transactions.

102.    For the reasons stated herein, Plaintiffs are entitled to a judgment under the Federal Declaratory Judgment Act and Federal Rule of Civil Procedure 57.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Acima Digital, LLC and Acima Holdings, LLC respectfully request that the Court grant each of the following forms of relief:

a.    All declaratory relief set forth above;

b.    A stay or injunction barring continuation of the CFPB's investigation and any civil action against Acima in connection with its activities in the lease-to-own industry or the bringing of any additional investigations, claims, or proceedings against Acima;

---

[6] *See* Hal Scott, *The CFPB's Pyrrhic Supreme Court Victory*, THE WALL STREET JOURNAL (May 20, 2024), https://www.wsj.com/articles/the-cfpb-pyrrhic-supreme-court-victory-federal-reserve-18099f59 ("Since the Treasury no longer receives any surplus from the Fed, central-bank funding can no longer be considered 'drawn from the Treasury.'  This means the agency can't rely on the Appropriations Clause—or last week's decision by the high court—to justify the legality of its continued operations.").

c.     A declaration that the CFPB's actions since 2022 are illegal and unconstitutional;

d.     An award of the attorneys' fees, costs, and expenses that Plaintiffs have incurred in connection with this action; and

e.     Such other and further relief, at law or in equity, as is just and proper.

Dated:  July 22, 2024                    Respectfully submitted,

                                         */s/ Paul R. Genender*

Matthew P. Previn (*pro hac vice* pending)     Paul R. Genender (Texas Bar No. 00790758)
   matthewprevin@paulhastings.com             paulgenender@paulhastings.com
Bradley J. Bondi (*pro hac vice* pending)      Manuel G. Berrelez (Texas Bar No. 24057760)
   bradbondi@paulhastings.com                 manuelberrelez@paulhastings.com
Traci Zeller (*pro hac vice* pending)          PAUL HASTINGS LLP
   tracizeller@paulhastings.com            2001 Ross Avenue, Suite 700-168
PAUL HASTINGS LLP                              Dallas, Texas 75201
2050 M Street NW                               Telephone: (972) 936-7500
Washington, DC 20036                           Facsimile: (972) 936-7501
Telephone: (202) 551-1700
Facsimile: (212) 551-0201

*Counsel for Plaintiffs Acima Digital, LLC and Acima Holdings, LLC*